UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IULIIA POTAPOVA,<br><br>              Plaintiff,<br><br>    v.<br><br>TOYOTA MOTOR CREDIT CORPORATION,<br><br>              Defendant. | Case No. 1:23-CV-00571<br><br>**TOYOTA MOTOR CREDIT CORPORATION'S STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1** |

1. On or about October 2, 2017, Sanat Yarmukhamedov ("Buyer") applied for and entered into a Motor Vehicle Lease Agreement for a 2017 Lexus RX 350 from Lexus of Queens ("Lease Agreement"). Iuliia Potapova ("Ms. Potapova" or "Plaintiff") was listed as co-applicant and co-lessee on the subject vehicle. **(See Ex. A to Murrin Aff.)**

2. The purchase was documented in the Lease Agreement and was assigned to TMCC. **(See Ex. A to Murrin Aff.)**

3. On or about September 9, 2019, TMCC responded to an Automated Credit Dispute Verification ("ACDV")[1] Report dated September 7, 2019 from TransUnion, LLC ("TransUnion") with a dispute code of "103: claiming true identity fraud". **(See Ex. B to Murrin Aff.)**

4. There were no images attached to the ACDV at that time. **(See Ex. B to Murrin**

---

[1] These forms are generated by credit reporting agencies upon receipt of a credit dispute from a consumer.

**Aff.)**

5. Pursuant to the relevant policies and procedures in place at the time, the credit dispute analyst would have pulled up the appropriate account file and all relevant and identifying information, such as co-buyer's name, address, social security number and birthdate were reviewed. **(See Murrin Aff.)**

6. This information provided on the ACDV report was then compared to TMCC's internal records for verification. **(See Murrin Aff.)**

7. In this instance, the last name, social security number and date of birth were all found to be the same. Ms. Potapova's first name was deemed "different", due to spelling inconsistencies. **(See Ex. B to Murrin Aff.)**

8. Account specific information such as payment history, account status and opening and closing dates were not reviewed as they are not considered relevant to a claim of "true identity fraud." **(See Murrin Aff.)**

9. Additionally, because the ACDV report did not contain any images, the information submitted (which was only what was contained in the ACDV report) was insufficient to request an ID theft investigation. **(See Murrin Aff.)**

10. On September 9, 2019, a form letter entitled Identity Theft Summary of Rights Letter #3088 was mailed to Plaintiff at the address provided on the ACDV report and verified by TMCC's own internal records, requesting additional information which would allow TMCC to open an ID theft investigation. **(See Ex. C to Murrin Aff.)**

11. The next ACDV on this account was not received until two years later, on October

18, 2022 again from TransUnion. This ACDV bore the dispute code "103: Claims true identity fraud, account fraudulently opened. Provide or confirm complete ID." **(See Ex. D to Murrin Aff.)**

12. Pursuant to TMCC's policies and procedures at that time, all relevant and identifying information, such as co-buyer's name, address, social security number and birthdate contained on the ACDV report were reviewed and then compared to TMCC's internal records. **(See Murrin Aff.)**

13. As before, the last name, date of birth and social security number matched. However, the first name was deemed "different" due to spelling inconsistencies. The ACDV report bore than name "Iulia" while TMCC's records had "Iuliia". **(See Ex. D to Murrin Aff.)**

14. The October 2022 ACDV contained images which included correspondence to Transunion claiming identity theft and denying signing of the lease agreement, a copy of her driver's license and a police report. **(See Ex. D to Murrin Aff.)**

15. At the time of receipt of October 2022 ACDV, an ID theft investigation had already been conducted and concluded as to Plaintiff. **(See Murrin Aff.)**

16. This investigation was concluded on or about October 2019 with a finding of non-fraud. **(See Murrin Aff.)**

17. The ID theft investigation and all documents attached thereto, including all documents provided by Plaintiff are available and viewable as to all credit dispute analysts. **(See Murrin Aff.)**

18. It is the policy and procedure of TMCC that credit dispute analysts are to review

3

the entirety of the account file to determine its status prior to responding to credit disputes. **(See Murrin Aff.)**

19. There is no evidence that this policy was not adhered to in this instance. **(See Murrin Aff.)**

20. Pursuant to the ID theft investigation which had previously been conducted and concluded, Plaintiff had provided a police report, an FTC ID Theft Affidavit, copies of her driver's license, copies of the lease agreement as well her statements that she was the victim of ID theft and had not signed the lease agreement. **(See Ex. N to Blunt Aff.)**

21. Because the ACDV report nor its attachments did not contain any new or additional information to assist TMCC in opening and/or conducting a new ID theft investigation, a letter was mailed to Plaintiff at the address provided in the ACDV report and verified pursuant to TMCC's own internal records requesting additional information which would allow TMCC to conduct an ID theft investigation. **(See Ex. E to Murrin Aff.)**

22. This same process occurred with ACDV reports received on October 20, 2022 and October 24, 2022 from Experian and Equifax respectively. **(See Ex. F and H to Murrin Aff.)**

23. On August 29, 2019, Plaintiff contacted TMCC via telephone and indicated that she was the victim of identity theft. **(See Ex. J to Blunt Aff.)**

24. Plaintiff stated that the "primary customer on account was a formal business partner and [she] never signed any agreement." **(See Ex. J to Blunt Aff.)**

25. Pursuant to this telephone call and statement from Plaintiff, on or about August 29, 2019, a Fraud Investigation Request was submitted to the Fraud Investigation Unit. **(See Ex. K to**

**Blunt Aff.)**

26. At that time, the account was not placed in XB status because no affidavit or supporting documents were received as part of Plaintiff's Fraud Investigation Request. **(See Ex. J to Blunt Aff.)**

27. The investigation was assigned to Christopher Blunt ("Mr. Blunt"). **(See Ex. L to Blunt Aff.)**

28. On or about September 4, 2019, Mr. Blunt contacted Ms. Potapova via telephone to discuss her claims. **(See Ex. J to Blunt Aff.)**

29. Pursuant to Mr. Blunt's communication with Ms. Potapova, she indicated among other information that:

- She was business partners with the alleged buyer on the vehicle account;
- The Buyer had previous requested that she co-signed for a vehicle purchase but she told him she would rather not but to let her know if he could not find anyone;
- She only found out about the vehicle through telephone calls from TMCC collections.

**(See Ex. J to Blunt Aff.)**

30. A dispute code of XB was placed on the account on or about September 9, 2019. **(See Ex. J to Blunt Aff.)**

31. Pursuant to the ID theft investigation, Mr. Blunt contacted Lexus of Queens in order to request a copy of the dealer jacket and to speak with dealer representatives regarding the circumstances surrounding the lease of the vehicle. **(See Ex. J to Blunt Aff.)**

32. On or about September 6, 2019, Mr. Blunt received the dealer jacket which shows

that the Plaintiff's stated NY Driver's License Number ending in 2272 matched the driver's license provided for the purchase of the vehicle. **(See Ex. J to Blunt Aff.)**

33. On September 20, 2019, Mr. Blunt further communicated with the dealer to inquire as to how Plaintiff's signature was obtained for the vehicle and how she provided her driver's license for copying. **(See Ex. J to Blunt Aff.)**

34. On or about September 6, 2019, Plaintiff provided TMCC with a Police Report and a copy of her Driver's License. **(See Ex. N to Blunt Aff.)**

35. On or about September 6, 2019, Mr. Blunt called the New York Police Department and spoke with Detective Fernandez. He was informed that the matter had been assigned to a Detective McCaffrey and assigned case no. 2382. **(See Ex. J to Blunt Aff.)**

36. On or about September 20, 2019, Mr. Blunt communicated with the Sales Manager at Lexus of Queens in order to gather information regarding the sale of the vehicle and its buyers. The Sales manager indicated that he would look into the deal and contact TMCC. **(See Ex. J to Blunt Aff.)**

37. On or about September 20, 2019, Mr. Blunt contacted the NY Police Department and asked for Detective McCaffrey but was advised she would be out of the office until the following week. **(See Ex. J to Blunt Aff.)**

38. Pursuant to the ID Theft investigation, Mr. Blunt conducted a thorough review of the Account Contact Notes and made notations regarding Plaintiff's frequent and various communications with TMCC. **(Blunt Aff.)**

39. Mr. Blunt noted that Plaintiff communicated via telephone call with TMCC on

over 20 different occasions between October 2018 and September 2019 and in each communication, Plaintiff confirmed her address and telephone number and connection to the account. **(See Ex. L and J to Blunt Aff.)**

40. Further, Mr. Blunt noted that Plaintiff indicated her knowledge of the account, her relationship with the buyer on the account and stated that she would speak with him regarding making payments on the account. **(See Blunt Aff.)**

41. Finally, Mr. Blunt noted that the first instance of Plaintiff stating that this account was not hers was in September 2019, a full two years after inception of the lease agreement. **(See Ex. L and J to Blunt Aff.)**

42. On or about September 20, 2019, Mr. Blunt called Buyer and left a voicemail for him to return the phone call to question the purchase of the vehicle to "get his side of the story". **(See Ex. J to Blunt Aff.)**

43. On or about September 20, 2019, Mr. Blunt communicated with the broker of the lease account and determined that the lease of the vehicle was conducted entirely online. The vehicle was delivered to the buyer and all paperwork was signed at delivery. **(See Ex. J to Blunt Aff.)**

44. On or about September 20, 2019 and September 26, 2019, Mr. Blunt contacted the dealer to discuss the details surrounding the delivery of the vehicle and the signer for the delivery. **(See Ex. J to Blunt Aff.)**

45. On or about September 26, 2019, Mr. Blunt left a message for Plaintiff requesting a call back to discuss the account. **(See Ex. J to Blunt Aff.)**

46. On or about September 26, 2019, Mr. Blunt called the buyer and left a message requesting a call back to discuss the account. **(See Ex. J to Blunt Aff.)**

47. On or about September 26, 2019, Mr. Blunt communicated with Plaintiff and explained that TMCC was unable to make a finding a fraud/ID theft at this point in the investigation. **(See Ex. J to Blunt Aff.)**

48. On or about September 30, 2019, Mr. Blunt communicated with Detective McCafferty who provided him with subpoena information for TMCC records via email. **(See Ex. J to Blunt Aff.)**

49. Pursuant to this phone call, Mr. Blunt went over the timeline of events leading to Plaintiff's allegations of fraud/ID theft including Plaintiff's various communications with TMCC since October 2018. **(See Ex. J to Blunt Aff.)**

50. On or about November 15, 2019, Mr. Blunt once again communicated with Det. McCaffrey who indicated that the police were unable to find fraud/ID theft in their own investigations. Further, Det. McCaffrey indicated that if Plaintiff were to continue pushing the matter, they would arrest her for filing a false police report. **(See Ex. J to Blunt Aff.)**

51. Pursuant to this telephone call, Mr. Blunt stated that TMCC would be closing their file as well without a finding of fraud/ID theft but to contact TMCC if anything changes. **(See Ex. J to Blunt Aff.)**

52. On or about June 29, 2020, Plaintiff filed an Identity Theft Dispute with TransUnion Fraud Victim Assistance Department, which included her FTC Identity Theft Report, Proof of Identity, Police Report, and FCRA Section 605 B. **(See Ex. O to Blunt Aff.)**

53. On or about June 29, 2020, Plaintiff filed an Identity Theft Dispute with Toyota/Lexus Financial Services about the disputed account asking them to close the account, remove any charges on the unauthorized account, and take steps to remove the information about the account from her credit files. Plaintiff provided the FTC Identity Theft Report, Proof of Identity, and the Notice to Furnishers of Information. **(See Ex. P to Blunt Aff.)**

54. On or about July 2, 2020, the account was placed in XB status while another review for fraud was instigated. **(See Ex. J to Blunt Aff.)**

55. On or about July 2, 2020, Mr. Blunt contacted Det. McCafferty as a follow up to their previous discussions of November 2019. **(See Ex. J to Blunt Aff.)**

56. Pursuant to this discussion, Mr. Blunt learned that subsequent to their discussion, Det. McCafferty had met with Plaintiff and made the following findings:

- The police were unable to substantiate Plaintiff's claims of fraud/ID theft;
- Plaintiff and Buyer had a business relationship together and Plaintiff stated that she would sign permits and other documents with Buyer;
- Plaintiff stated that she did not understand what she was signing and did not understand English due to being new to the United States;
- The police believed that Plaintiff was trying to disassociate herself from buyer because the business failed and her credit was affected;
- The police were unable to find Buyer, but they believed that he was living in Pennsylvania;
- The police would not be pursuing Buyer for fraud. **(See Ex. J to Blunt Aff.)**

57. On or about July 2, 2020, Mr. Blunt concluded the re-investigation and determined

that the matter remain closed as non-fraud. **(See Ex. J to Blunt Aff.)**

58. On or about July 13, 2020, a fraud note was added to the account stating that the investigation will remain closed as non-fraud. **(See Ex. J to Blunt Aff.)**

59. Defendant, TMCC provided accurate information regarding Plaintiff to the credit reporting agencies at all times. **(See Blunt Aff. And Murrin Aff**.)

60. Defendant, TMCC had reason to belief that the information it furnished was accurate. **(See Blunt Aff. And Murrin Aff**.)

61. Defendant, TMCC conducted a reasonable investigation of Plaintiff's dispute under the law. **(See Blunt Aff. And Murrin Aff**.)


Dated: December 14, 2023

/s/ *Dafney Dubuisson Stokes*
Dafney Dubuisson Stokes, Esq.
WONG FLEMING, P.C.
*Attorneys for Defendant American Honda Finance Corporation*
821 Alexander Road, Suite 200
Princeton, NJ 08540
Tel: (609) 951-9520
Fax: (609) 951-0270
Email: dstokes@wongfleming.com